**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:25-cv-21998-WPD

CARLSON PET PRODUCTS, INC.,

    Plaintiff,

v.

THE INDIVIDUALS, CORPORATIONS,
LIMITED LIABILITY COMPANIES,
PARTNERSHIPS, AND
UNINCORPORATED ASSOCIATIONS
IDENTIFIED ON SCHEDULE A,

    Defendants.

_____/

**PLAINTIFF'S *EX PARTE* MOTION FOR TEMPORARY RESTRAINING ORDER, ASSET RESTRAINT, EXPEDITED DISCOVERY, AND AN ORDER TO SHOW CAUSE AS TO WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE**

Pursuant to 35 U.S.C. § 283, Fed. R. Civ. P. 65, The All Writs Act, 28 U.S.C. § 1651(a), Plaintiff Carlson Pet Products, Inc. ("Carlson"), respectfully moves on an *ex parte* basis for entry of a temporary restraining order ("TRO"), asset restraint, expedited discovery, and an order to show cause as to why a preliminary injunction should not be issued against defendants, the Individuals, Partnerships, and Unincorporated Associations identified on Schedule A to the Complaint (collectively, the "Defendants"). In support, Carlson respectfully refers and relies upon the following Memorandum of Law.

**MEMORANDUM OF LAW**

**I.  INTRODUCTION AND SUMMARY OF ARGUMENT.**

Carlson brings this action against the Defendants identified on Schedule A to the Complaint for infringement of the claims of Carlson's U.S. Patent No. 11,085,233 ("'233 Patent"). As alleged

in the Complaint, Defendants are making, importing, marketing, distributing, offering for sale, and selling barrier gate products in the United States (including within this Judicial District) that infringe the claims of the '233 Patent (the "Accused Products"), through Amazon.com Inc.'s online retail marketplace and ecommerce platform ("Amazon") operating under at least the names, online marketplace accounts and storefronts listed on Schedule A to the Complaint (the "Seller IDs"). Defendants run an illegal operation with disregard for anything except generating profits.

Defendants create numerous online marketplace accounts and storefronts that sell unauthorized, unlicensed, and inferior products that infringe the '233 Patent, rather than genuine Carlson patented safety and barrier gate products, to unknowing consumers on Amazon. These accounts and storefronts share unique identifiers, such as using the same or similar product images, advertising, design elements, and similarities of the Accused Products offered for sale, thereby establishing a logical relationship between them and suggesting that Defendants' illegal operations arise out of the same infringing product, same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid liability by concealing both their identities and the full scope and interworking of their illegal operation.

This Court has personal jurisdiction over Defendants because each Defendant targets Florida residents and has offered to sell, and on information and belief, has sold and continues to sell the Accused Products to consumers within the United States, including the State of Florida. Specifically, Defendants are reaching out to do business with Florida residents by operating one or more commercial, interactive storefronts on Amazon through which Florida residents can purchase products infringing the claims of the '233 Patent and have them shipped to Florida. Defendants directly target unlawful business activities toward consumers in Florida, cause harm to Carlson's business within this Judicial District, and have caused and will continue to cause

irreparable injury to Carlson. Defendants deceive the public by trading upon Carlson's reputation and goodwill by making, importing, distributing, offering for sale and selling unauthorized products that infringe Carlson's '233 Patent.

Defendants' ongoing unlawful activities should be restrained, and Carlson respectfully requests that the Court issue an *ex parte* TRO: (1) temporarily restraining Defendants' continued manufacture, importation, distribution, offering for sale, and sale of the Accused Products; (2) temporarily restraining Defendants' assets to preserve Carlson's right to an equitable accounting; and (3) authorizing expedited discovery allowing Carlson to inspect and copy Defendants' records relating to their infringement and financial accounts.[1]

In light of the covert nature of offshore illegal activities and the vital need to establish an economic disincentive for such activities, courts regularly issue such orders. *See, e.g., Max'Is Creations Inc. v. Individuals*, Civil Action No. 23-20341-Civ-Scola, 2023 U.S. Dist. LEXIS 41188 (S.D. Fla. Feb. 7, 2023) (order granting relief requested here); *Lead Creation Inc. v. P'ships & Unincorporated Ass'ns Identified on Schedule A*, No. 8:23-cv-49-CEH-CPT, 2023 U.S. Dist. LEXIS 25025 (M.D. Fla. Feb. 14, 2023) (same).

Carlson's well-pleaded factual allegations, which must be accepted as true, and testimonial evidence, establish that issuing a TRO against Defendants is necessary and proper. Carlson can demonstrate a strong likelihood of success that Defendants infringe one or more claims of the '233 Patent. In addition, Defendants have irreparably harmed and continue to irreparably harm Carlson through loss of market share, damage to its goodwill and reputation, and deprivation of the exclusive right to the inventions of the '233 Patent. Monetary damages are inadequate to

---

[1] Carlson concurrently has filed a motion for alternative service to authorize service by email and electronic publication.

compensate Carlson for these damages.  This makes injunctive relief particularly appropriate in this matter.

Indeed, 35 U.S.C. § 283 authorizes the Court to "grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  Moreover, under Federal Rule of Civil Procedure 65(d)(2)(C), the Court has the power to bind any third parties, such as service providers and financial institutions that are in active concert with Defendants and aid and abet Defendants and are given actual notice of the order.  Finally, a prejudgment asset freeze is also appropriate because Carlson seeks equitable relief and a reasonable royalty measured by Defendants' profits.  *See Max'Is Creations Inc.*, 2023 U.S. Dist. LEXIS 41188, at *11.

## II.  STATEMENT OF FACTS

### A.  Carlson's Patented Safety and Barrier Gate Products.

Carlson is a family-owned company that since 2006, has been extensively engaged in the business of manufacturing and marketing in interstate commerce a wide variety of pet gates and other pet related products.  (*See* Flannery Decl.[2] at ¶ 4.)  It is a pioneering company that began when it realized that pet gates did not exist specifically for pet owners, who then used baby gates that often were not big, strong, or high enough to keep pets inside or outside of an area.  (*Id.* at ¶ 5.)  Since its inception, Carlson's commitment to innovation and quality has in large part fueled its tremendous growth.  (*Id.* at ¶ 6.)  It has become one of the world leaders in the production and distribution of safety and barrier gate products at issue in this matter.  (*Id.*)  Carlson has invested substantial resources in the development of its safety and barrier gate products and establishing its

---

[2]   The Declaration of Shane A. Flannery accompanies this Motion.

reputation among consumers as having industry-leading products of the highest quality, safety, and performance. (*Id.*)

Carlson's ongoing efforts and the innovations resulting therefrom have given rise to numerous United States patents that cover many novel and unique aspects of its line of products, including the '233 Patent, which is directed to novel and unique safety and barrier gate features. (*Id.* at ¶ 7.) On August 10, 2021, the United States Patent and Trademark Office ("USPTO") duly and regularly issued the '233 Patent, entitled "Gate Apparatus With Springless Automatic Return Gate," to Carlson. (*Id.* at ¶¶ 7-8) Carlson offers for sale and sells products that embody the inventions of the '233 Patent. (*Id.* at ¶ 9.)

Carlson has invested a substantial amount of effort and expense in promoting these products and in ensuring their high quality and performance. (*Id.* at ¶ 9.) They have been and continue to be certified by industry standards organizations, symbolizing Carlson's commitment to the highest in safety and quality. (*Id.*) These gate products have been widely marketed throughout the United States, and their sales have been and are significant. (*Id.*) As a result, Carlson's safety and barrier gates have become widely and favorably accepted; they have developed significant goodwill among consumers and generated a reputation for quality and value; and they are recognized and exclusively associated by consumers as being products sourced from Carlson. (*Id.* at ¶ 10.) For example, over the years, Amazon, the well-known online retail marketplace and ecommerce platform, has recognized Carlson's gate products as "Best Seller," "Overall Pick," or "Amazon Choice" – designations that indicate Carlson's products are high-quality, popular, highly rated and well-priced. (*Id.* at ¶ 11.)

Carlson's remarkable success has attracted the attention of copycats that infringe Carlson's intellectual property rights, including the '233 patent, and who seek to exploit the goodwill that it

5

has built with its high quality, reliable gate products. (*Id.* at ¶ 13.) Defendants are among these copycats.

**B.      Defendants' Unlawful and Deceptive Activities.**

Carlson has identified numerous online marketplace accounts and storefronts identified in Schedule A to the Complaint, which sell the Accused Products that utilize the technology of, and inventions claimed in the '233 Patent from foreign countries to consumers in this District. (*Id.* at ¶¶ 13-14.)

Defendants typically facilitate sales by creating online marketplace accounts and storefronts so that they appear to unknowing consumers to be selling legitimate barrier gate products. (*See id.* at. ¶¶ 22-24.) These accounts and storefronts often include similar product images, advertising, design elements, layouts that make it difficult for consumers to distinguish the Accused Products from genuine, patented Carlson gate products. (*See id.*) In addition, the Accused Products offered in the Defendant Internet Stores bear similar irregularities and indicia of being infringing products, suggesting that the Accused Products originate from a common source and that, upon information and belief, the Accused Products are the same product and Defendants are interrelated. (*Id.* at ¶¶ 14, 24, 27.) Carlson has not licensed or authorized Defendants to manufacture, import, export, advertise, offer for sale, or sell any product covered by the claims of the '233 Patent, and none of the Defendants is an authorized retailer of genuine Carlson products. (*Id.* at ¶¶ 12, 22, 34.)

Further, Defendants go to great lengths to conceal their identities and often use multiple fictitious names and addresses to register and operate their massive network of online marketplace accounts and storefronts. (*Id.* at ¶ 26.) For example, many of Defendants' names and physical addresses used to register the Defendant Domain Names are incomplete or contain randomly typed

letters. (*Id.*) Defendants also regularly create new online marketplace accounts on various platforms using the identities listed in Schedule A to the Complaint, as well as other unknown fictitious names and addresses. (*Id.*) Defendants use these common tactics to conceal the full scope of their massive illegal operation, and to avoid being shut down. (*Id.*)

## III. ARGUMENT

Defendants' purposeful, intentional, and unlawful conduct is causing, and will continue to cause, irreparable harm to Carlson. To stop Defendants' sale of the Accused Products, Carlson respectfully requests that this Court issue a TRO ordering, among other things, expedited discovery regarding Defendants and the freezing of their assets. Without the requested relief, Defendants' unlawful activities will continue unabated, and Carlson and consumers will suffer irreparable harm.

### A. An *Ex Parte* TRO Is Appropriate and Necessary.

Rule 65(b) of the Federal Rules of Civil Procedure provides that the Court may issue an *ex parte* TRO where immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition. FED. R. CIV. P. 65(b). Defendants here fraudulently manufacture, import, market, offer to sell, and sell goods utilizing the technology of and inventions claimed in the '233 Patent through the Defendant Internet Stores. The entry of a TRO is appropriate because it would immediately stop the Defendants from benefiting from their wrongful use of Carlson's patent and preserve the status quo until such time as a hearing can be held.

In the absence of a TRO without notice, Defendants can and likely will move any assets from U.S.-based bank accounts and take other steps to evade enforcement, such as redirecting traffic to other storefronts and websites they control. Courts have recognized that civil actions

against infringers present special challenges that justify proceeding on an *ex parte* basis. *See Dell Inc. v. BelgiumDomains*, LLC, No. 07-22674, 2007 U.S. Dist. LEXIS 98676, at *5-6 (S.D. Fla. Nov. 20, 2007) (finding *ex parte* relief more compelling where Defendants' scheme "is in electronic form and subject to quick, easy, untraceable destruction by Defendants.").

Accordingly, Carlson respectfully requests that this Court issue the requested *ex parte* TRO.

### B.     The Court May Exercise Personal Jurisdiction Over Defendants.

Personal jurisdiction exists over Defendants in this Judicial District pursuant to Fl. Stat. § 48.193(1)(a)(1), (2), and (6), and FED. R. CIV. P. 4(k), because the Defendants' Amazon storefronts accept orders of the Accused Products from, and offer shipping to, Florida addresses located in this Judicial District. *See Elite Aluminum Corp. v. Trout*, 451 F. Supp. 2d 1311, 1314 (S.D. Fla. 2006). Indeed, courts regularly exercise personal jurisdiction over defendants that operate e-commerce stores offering for sale and selling of infringing products to Florida residents over the Internet. *See, e.g., Betty's Best, Inc. v. Individuals*, No. 1:23-cv-22322-KMW, 2023 U.S. Dist. LEXIS 207706, at *21-23 (S.D. Fla. Nov. 17, 2023) (preliminary injunction after granting TRO); *Max'Is Creations,* 2021 U.S. Dist. LEXIS 180656, at *3 (same).

As detailed in the Complaint and the accompanying Declaration of Shane A. Flannery, Carlson's investigation into Defendants confirms that Defendants' Amazon storefronts allow for the Accused Products to be sold and shipped to addresses in this Judicial District. (*See* Flannery Decl. at ¶¶ 18-20.) In fact, Exhibit 4 to the Flannery Declaration contains copies of order confirmations placed, accepted, and shipped by Defendants for the sale of the Accused Products to this District. (*See id*.) The Amazon Marketplace is structured to ship products anywhere in the

United States, including this Court's jurisdiction. (*See id.*) For these reasons alone, the Court can exercise personal jurisdiction over Defendants.

**C.     The Standards for TRO and Preliminary Injunction Are Met.**

The standards for granting a TRO and a preliminary injunction are identical. *Chenming Zhou v. Individuals*, Civil Action No. 22-24013-Civ-Scola, 2023 U.S. Dist. LEXIS 41303, at *6 (S.D. Fla. Jan. 23, 2023) (citing *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1225 (11th Cir. 2005)).  To obtain a TRO or a preliminary injunction, a party must establish "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3) that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4) that entry of the relief would serve the public interest." *Schiavo ex rel. Schindler*, 403 F.3d at 1225-26; *see also Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (affirming entry of preliminary injunction and freezing of assets). Carlson's evidence establishes each factor.

**D.     Carlson Has a Strong Likelihood of Success on Its Patent Infringement Claim.**

The United States Patent Act provides that "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. §271(a).  To demonstrate a likelihood of success on the merits of a patent infringement claim, a patentee must show that: (1) it will likely prove infringement of at least one claim of the asserted patent; and (2) its infringement claim will likely withstand challenges, if any, to the validity of the patent.  *See Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, at 1376 (Fed. Cir. 2009). To meet this burden, a patentee must prove that "success in establishing infringement is more likely than not." *Trebro Mfg., Inc. v. FireFly Equip., LLC*, 748 F.3d 1159, 1166 (Fed. Cir. 2014)

9

(internal quotation marks omitted). "To establish infringement of a patent, every limitation set forth in a claim must be found in an accused product or process exactly or by a substantial equivalent." *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989).

There is no dispute that Carlson is the lawful assignee of all right, title, and interest in and to the '233 Patent. (Flannery Decl. at ¶¶ 7-8.) In addition, Carlson presents substantial evidence demonstrating several representative examples of Defendants' infringement of the '233 Patent. As shown in the accompanying Flannery Declaration, each element of Claim 1 of the '233 Patent is mapped to exemplary examples of the Accused Products. (Flannery Decl. at ¶¶ 17-19, Exs. 2-3.) Therefore, Defendants infringe the claims of the '233 Patent by making, distributing, offering to sell, and selling the Accused Products.

With respect to validity, it is axiomatic that patents enjoy a statutory presumption of validity. 35 U.S.C. § 282. In the preliminary injunction context, if an "alleged infringer . . . launch[es] an attack on the validity of the patent, the burden is on the challenger to come forward with evidence of invalidity." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009). To defeat an injunction based on invalidity, the challenger must establish a substantial question of invalidity. *See id*. at 1377-78. Thus, Carlson is not required to make any further demonstration on these issues unless and until they are raised. *New England Braiding Co. v. A.W. Chesterton Co.*, 970 F.2d 878, 882 (Fed. Cir. 1992). Accordingly, in the present case, "the very existence of the ['233 Patent] satisfies [Carlson's] burden on validity." *Purdue Pharma L.P. v. Boehringer Ingelheim GMBH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001).

Accordingly, Carlson is likely to succeed on the merits of their patent infringement claim against Defendants.

D. **Carlson Will Continue to Suffer Irreparable Harm in the Absence of Preliminary Relief.**

Carlson has no adequate remedy at law in light of the irreparable harm Defendants' continued infringement is causing Carlson, and Carlson will continue to be irreparably harmed absent preliminary relief enjoining Defendants' unlawful infringement in the future.

"[T]he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (citations omitted). Irreparable harm may be demonstrated by showing that Defendants' infringement has caused or will cause, *inter alia*, loss of market share, loss of goodwill and damage to reputation, or deprivation of the exclusive right to the patented invention. *See id*. (citations omitted); *Douglas Dynamics, LLC v. Buyers Prods. Co*., 717 F.3d 1336, 1344-45 (Fed. Cir. 2013); *Robert Bosch LLC v. Pylon Mfg. Corp*., 659 F.3d 1142, 1149 (Fed. Cir. 2011).

Under the present circumstances, there can be little doubt that Carlson has suffered, and will continue to suffer, lost sales and market share, harm to their reputation and goodwill, and loss of the right to exclusivity, all of which it has endeavored to establish over the years. (Flannery Decl. at ¶¶ 30-39.) The Accused Products compete head-to-head with Carlson's patented products on Amazon, where Carlson earns a substantial part of its revenue. (*Id*. at ¶ 31.) Defendants have positioned the Accused Products on Amazon as a substitute for Carlson's gate products. As a result, Carlson has lost revenue and market share to the Accused Products, and it will continue to do so if Defendants' infringement is not stopped. (*Id*. at ¶¶ 30-31.) This harm alone is irreparable. *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm – often irreparable – of being forced to compete against products that incorporate and infringe its own patented inventions."); *see Tinnus Enters. LLC*, 846 F.3d at 1200-01 (affirming preliminary injunction where patent owner and accused infringer are direct competitors).

Defendants' unlawful use of the technology claimed in the '233 Patent in the Accused Products also has damaged Carlson's reputation and goodwill. Carlson has generated valuable goodwill and a coveted reputation among consumers as having industry-leading products that are certified in full compliance with all industry standards. (Flannery Decl. at ¶¶ 9-10.) Defendants have positioned the Accused Products as Carlson look-alikes to sponge off of Carlson's goodwill and reputation, appropriating not only the patented features of Carlson's gate products, but also mimicking the manner in which Carlson markets them. Significantly, while the Accused Products may look identical to Carlson's gate products, Defendants are selling inferior products. (*Id*. at ¶ 13.) As the Federal Circuit has noted, an infringing competitor who sells an inferior product that incorporates patented technology is likely to cause irreparable harm by not only by diverting sales but also by eroding the patent owner's "reputation and brand distinction." *Douglas Dynamics*, 717 F.3d at 1344.

In addition, Defendants have deprived Carlson's right to exclude. Under the Patent Act, Carlson has a right to exclude. *See* 35 U.S.C. § 271(a). Embodied in that right is an ability to protect one's product and establish a controlling market share. Unlike some patentees, Carlson has not licensed its patents to others. (Flannery Decl. at ¶ 34.) Instead, Carlson has focused on controlling a portion of the market with its innovative patented designs. *See Celsis In Vitro*, 664 F.3d at 930-31 ("During the growth stage of a product, it is particularly crucial to be able to distinguish oneself from competitors. This includes building the brand, expanding the customer base, and establishing one's reputation and leadership in the market."); *see also Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994) ("Because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole.") Carlson is entitled to exclude

Defendants and protect its market share to avoid otherwise irreparable harm. An injunction here will allow Carlson to maintain its exclusivity on products embodying its inventions. Also, an injunction will likely deter other infringers who otherwise might be tempted to piggyback on Carlson's success and exploit the market it has created with its patented safety and barrier gate products.

Because Defendants have and continue to irreparably harm Carlson, monetary damages are inadequate to compensate Carlson.

### E.     The Balance of Equities Favor Carlson.

The balance of equities weighs decidedly in favor of Carlson. When evaluating the third factor of the preliminary injunction analysis, the Court must weigh the harm to the accused infringer if the Court wrongly issues a preliminary injunction against the harm to the patentee if the Court wrongly denies the injunction. *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987). In weighing these harms, the Court must consider the patentee's likelihood of success on the merits. *Id*. The higher the patentee's likelihood of success, the less likely that accused infringer would be "harmed" at all. This balance of hardships factor weighs in Carlson's favor because it is highly likely to succeed on the merits as reflected above.

The balance of hardships factor weighs in Carlson's favor for other reasons. Defendants cannot complain that they will suffer injury if preliminarily enjoined, because any potential injury has been caused by Defendants themselves. Defendants have embarked on an intentional scheme of unlawfully trading off of the innovations, identity, and goodwill that Carlson has built in its industry-leading safety gates, in order to enhance their own commercial activities. At a minimum, Defendants have been on constructive notice of the '233 Patent and given the parties' relationship in a highly competitive industry where competitors closely monitor each other's products,

developments, and patents, Defendants undoubtedly have been aware of the '233 Patent as well. Notwithstanding this notice, Defendants have purposefully manufactured, offered to sell, and sold inferior knockoffs of Carlson's patented gate products. Thus, Defendants can hardly claim to be harmed, since they have brought any and all difficulties occasioned by the issuance of an injunction upon themselves. *See Windsurfing Int'l, Inc. v. AMF, Inc.,* 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected."); *Smith & Nephew, Inc. v. Synthes (U.S.A.)*, 466 F. Supp.2d 978, 984-85 (W.D. Tenn. 2006) (finding that impact of ceasing operations related to infringing product did not weigh in favor of infringer, where such hardship "is the consequence of a patent infringement").

Even if, *arguendo*, Defendants could so complain, it is highly unlikely that they will suffer irreparable harm if preliminarily enjoined. Defendants would not be prevented from making or offering safety or barrier gate products, provided that they are non-infringing. An injunction will simply stop Defendants from making and selling products that infringe the claims of the '233 Patent. Moreover, any purported harm that might be occasioned by an injunction could be offset by an injunction bond and would ensure that Defendants receive compensation. Conversely, Carlson has no such assurance.

      F.    **The Public Interest Favors Carlson.**

The public interest analysis also weighs in Carlson's favor. First, the public interest favors the enforcement of patent rights. *PPG Indus., Inc. v. Guardian Indus. Corp.*, 75 F.3d 1558, 1567 (Fed. Cir. 1996); *see also Apple Inc. v. Samsung Elecs. Co.*, 809 F.3d 633, 647 (Fed. Cir. 2015) ("the public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions."). The question is

14

not whether the public has some interest that would be injured by the grant of preliminary relief. The question is whether a preliminary injunction would injure some particular, "critical public interest." *Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1458 (Fed. Cir. 1988). In the present case, the public has no "critical" interest in having Defendants continue to sell their infringing products, particularly when the products are not certified by industry standards organizations and Defendants are trying to trade upon the goodwill and reputation of others. Conversely, the public does have an interest in enjoining cheap copies of patented inventions, "which have the effect of inhibiting innovation and incentive." *Douglas Dynamics*, 717 F.3d at 1346. "This detrimental effect, coupled with the public's general public interest in the judicial protection of property rights in inventive technology, outweighs any interest the public has in purchasing cheaper infringing products." *Id*.

## IV. THE EQUITABLE RELIEF SOUGHT IS APPROPRIATE.

The Patent Act authorizes courts to issue injunctive relief "in accordance with principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. Furthermore, Rule 65(b) of the Federal Rules of Civil Procedure provides that a court may issue a temporary restraining order without notice where facts show that the movant will suffer immediate and irreparable injury, loss, or damage before the adverse party can be heard in opposition. Moreover, under Federal Rule of Civil Procedure 65(d)(2)(C), this Court has the power to bind any third parties, such as service providers and financial institutions, who are in active concert with the Defendants or who aid and abet Defendants and are given actual notice of the order. Fed. R. Civ. P. 65. The facts in this case warrant such relief.

### A. A TRO Immediately Enjoining Defendants' Patent Infringement Is Appropriate.

Carlon requests a TRO requiring the Defendants to immediately cease all use of the '233 Patent. Such relief is necessary to stop the ongoing harm to Carlson, its patent and associated goodwill, as well as harm to consumers, and to prevent the Defendants from continuing to benefit from their unauthorized use of the inventions of the '233 Patent. The need for *ex parte* relief is magnified in today's global economy where infringers can operate over the Internet in an anonymous fashion. Carlson is currently unaware of both the true identities and locations of the Defendants, as well as other online accounts and storefronts that may be used to distribute the Accused Products.

Many courts have recognized that civil actions against infringers present special challenges that justify proceeding on an *ex parte* basis. *See Dell Inc.*, 2007 U.S. Dist. LEXIS 98676, at *5-6. These challenges are especially acute where, as here, the infringers' businesses are built around the deliberate misappropriation of rights and property belonging to others, and they justify proceeding on an *ex parte* basis in this case.

### B.     Preventing the Fraudulent Transfer of Assets Is Appropriate.

Carlson respectfully requests an *ex parte* restraint of Defendants' assets so that Carlson's right to the payment of reasonable royalties and lost profits to Defendants from sales of the Accused Products is not impaired. If such a restraint is not granted in this case, Defendants are likely to fraudulently transfer financial assets to other indiscernible accounts. Specifically, it appears that the Defendants primarily reside in the People's Republic of China. Thus, it is highly likely that Defendants hold most of their assets in offshore accounts, making it easy to conceal their assets, which will effectively bar Carlson from the possibility of relief.

Courts have the inherent authority to issue a prejudgment asset restraint when plaintiff's complaint seeks relief in equity. *Max'Is Creations Inc.*, 2023 U.S. Dist. LEXIS 41188, at *11

(ordering restraint of assets where plaintiff sought equitable relief and reasonable royalty for patent infringement); *Lead Creation Inc.*, 2023 U.S. Dist. LEXIS 25025, at *14 (ordering asset restraint where plaintiff sought equitable relief for patent infringement); *Animale Grp. Inc. v. Sunny's Perfume Inc.*, 256 F. App'x 707, 709 (5th Cir. 2007); *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995). Carlson has demonstrated that it will likely succeed on the merits of its claims. As such, and in accordance with the Patent Act, Carlson will be entitled to the payment of reasonable royalties and the profits earned by Defendants throughout the course of their illicit scheme. *See* 35 U.S.C. § 284. Therefore, this Court has the inherent equitable authority to grant Carlson's request for a prejudgment asset freeze to preserve the relief sought by it. *See SEC v. ETS Payphones*, 408 F.3d 727, 735 (11th Cir. 2005) (finding it proper to freeze all of the defendant's assets, because it was necessary to preserve sufficient funds for the potential disgorgement in the case).

The Eleventh Circuit has previously upheld the Court's authority to restrain assets, particularly when defendants have the ability to eliminate their evidentiary trails by conducting their business entirely over the Internet. *See e.g., Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982 (11th Cir. 1995). Requesting "equitable relief [such as this] 'invokes the district court's inherent equitable powers to order preliminary relief, including an asset freeze, in order to assure the availability of permanent relief.'" *Levi Strauss & Co.*, 51 F.3d at 987 (citing *Federal Trade Commission v. United States Oil and Gas Corp.*, 748 F.2d 1431, 1433–34 (11th Cir. 1984)). Further, courts in this District have held that they may issue broad asset restraints to preserve the availability of permanent relief, including assets that are not directly traceable to the fraudulent activity that serves as a basis for the equitable relief requested. *See S.E.C. v. Lauer*, 445 F. Supp.2d

1362, 1364 (S.D. Fla. 2006) (upholding temporary freeze of all of defendant's assets to maintain the status quo).

Carlson has shown a likelihood of success on the merits, an immediate and irreparable harm suffered as a result of Defendants' conduct, and that, unless Defendants' assets are restrained, Defendants will likely hide or move their ill-gotten funds to offshore bank accounts. Accordingly, the grant of an injunction preventing the transfer of Defendants' assets is proper.

### C.  Expedited Discovery Is Appropriate.

The United States Supreme Court has held that "federal courts have the power to order, at their discretion, the discovery of facts necessary to ascertain their competency to entertain the merits." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). Courts have wide latitude in determining whether to grant a party's request for discovery. *Id*. (citation omitted). Further, courts have broad power over discovery and may permit discovery to aid in the identification of unknown defendants. See FED. R. CIV. P. 26(b)(2). Carlson respectfully requests expedited discovery to discover Defendants' identities, and the bank and payment service accounts used for their unlawful illicit operations. The expedited discovery requested in the proposed order is limited to include only what is essential to prevent further irreparable harm. Discovery of these financial accounts so that they can be frozen is necessary to ensure these activities can be contained. Without being able to discover Defendants' bank and payment system accounts, any asset restraint would be of limited value because Carlson would not know the entities upon whom to serve the order. Indeed, courts have broad power over discovery and may permit expedited discovery in cases such as this one where identities of the defendants are obscured due to their use of technology or third parties. *See* FED. R. CIV. P. 26(b)(2); *3M Co. v. Individuals, P'ships, & Unincorporated*

*Ass'ns identified in Schedule "A"*, No. 20-cv-2348 (SRN/TNL), 2020 U.S. Dist. LEXIS 217813, at *12-13 (D. Minn. Nov. 20, 2020).

Carlson's undersigned counsel is aware that the third-party marketplaces and payment services contemplated in the proposed order have cooperated with intellectual property owners in prior cases and under similar circumstances and are accustomed to doing so as part of their business operations. These third parties can comply with these expedited discovery requests without undue burden.

## V. A BOND SHOULD SECURE THE INJUNCTIVE RELIEF.

Rule 65(c) allows courts wide discretion to set the bond amount, and even to dispense with any bond requirement. Fed. R. Civ. P. 65(c); *see also BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005) ("[I]t is well-established that the amount of security required by the rule is a matter within the discretion of the trial court ...[, and] the court may elect to require no security at all.").

Because of the strong and unequivocal nature of Carlson's evidence of patent infringement, Carlson respectfully requests the Court require Carlson to post a bond of no more than five thousand dollars ($5,000.00), subject to increase at the Court's discretion should an application be made in the interest of justice.

## VI. CONCLUSION

For foregoing reasons, Carlson respectfully requests the Court grant its Motion, enter an Order for entry of a TRO, asset restraint, expedited discovery, and to show cause as to why a preliminary injunction should not be issued against Defendants, and schedule a hearing on Carlson's motion before the expiration of the temporary restraining order. Additionally, due to the time provisions of a TRO, in the event the application is granted, Carlson respectfully requests the

Court to provide a copy of the TRO to its counsel via e-mail at BLiddle@cozen.com, so that Carlson may immediately effectuate any relief ordered therein and provide Defendants proper notice of the order and any subsequent hearing date.

Dated: May 1, 2025

Respectfully submitted,

**COZEN O'CONNOR**

By: /s/ *Maria Ermakova*
Maria Ermakova (FBN 1056797)
E-mail mermakova@cozen.com
COZEN O'CONNOR, P.C.
200 South Biscayne Blvd., Suite 3000
Miami, Florida 33131
Telephone: 305-397-0807

Bradley D. Liddle (*pro hac vice forthcoming*)
Texas Bar Number 24074599
E-mail  bliddle@cozen.com
COZEN O' CONNOR, P.C.
1717 Main Street, Suite 3100
Dallas, Texas 75201

Frederick A. Tecce (*pro hac vice* forthcoming)
Pennsylvania Bar Number 47298
E-mail: fred.tecce@altimaadvisors.com
ALTIMA ADVISORS/ATTORNEYS, LLC
One Liberty Place – 55th Floor 1650 Market Street
Philadelphia, PA 19103
Telephone: 215-268-7525
Facsimile: 215-268-7526

*Attorneys for Plaintiff*
CARLSON PET PRODUCTS, INC.